**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KEITH REGAN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| TEMPLE UNIVERSITY, | : | |
| Defendant. | : | No. 19-3742 |

**<u>MEMORANDUM OPINION</u>**

**Timothy R. Rice**                                                      **April 7, 2022**
**U.S. Magistrate Judge**

Plaintiff Keith Regan sued Defendant Temple University for: (1) discrimination, retaliation, and failure to accommodate under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"); and (2) interference with, and retaliation prohibited by, the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. ("FMLA"), following the termination of his employment.  Compl. (doc. 1) ¶¶ 34-55.  Temple seeks summary judgment on all claims.  SJ Mot. (doc. 26).  I grant Temple's motion and enter judgment for Temple because no reasonable jury could find that its reasons for firing Regan were pretextual.  See <u>Kautz v. Met-Pro Corp.</u>, 412 F.3d 463, 476 (3d Cir. 2005) ("Our Court has held that the plaintiff must demonstrate that each of the employer's proffered nondiscriminatory reasons are pretextual.").

I.    <u>Legal Standard</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The evidence and any inferences from the evidence must be viewed in the light most favorable to the non-moving party.  See <u>Ray v. Warren</u>, 626 F.2d 170, 173 (3d Cir. 2010).  If reasonable minds could conclude that there are sufficient facts to support a plaintiff's claims, summary judgment

1

should be denied.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment should be granted only if no "reasonable jury could return a verdict for the nonmoving party," based on the evidentiary record.  Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010).

The ADA prohibits discrimination based on an individual's own disability or their association with a disabled person.  42 U.S.C. § 12112(a).  To prove a direct ADA employment discrimination claim, a plaintiff must show: (1) a qualifying disability; (2) an ability to perform the job; and (3) an adverse employment action caused by discrimination.  Gibbs v. City of Pittsburgh, 989 F.3d 226, 229 (3d Cir. 2021).  To prove an ADA employment associational discrimination claim, a plaintiff must show: (1) a qualifying disability; (2) an ability to perform the job; (3) a known association with someone with a disability; and (4) an adverse employment action caused by discrimination.  Pollere v. USIG Pennsylvania, Inc., 136 F. Supp. 3d 680, 685 (E.D. Pa. 2015) (citing, inter alia, Erdman v. Nationwide Ins. Co., 582 F.3d 500, 510 (3d Cir. 2009)).  To establish a failure to accommodate under the ADA, a plaintiff must prove: (1) a qualifying disability; (2) an ability to perform the job; and (3) the employer either refused to provide a proposed reasonable accommodation, or failed to engage in an interactive process after a reasonable, feasible accommodation was requested.  Solomon v. Sch. Dist. of Philadelphia, 882 F. Supp. 2d 766, 779 (E.D. Pa. 2012) (citing, inter alia, Donahue v. Consol. Rail Corp., 224 F.3d 226, 229 (3d Cir. 2000) (Alito, J.)).

To prove an employer "interfered" with his FMLA rights, an employee must show: (1) he and his employer were subject to the FMLA; (2) he was entitled to FMLA leave; (3) he gave notice of his intention to take FMLA leave; and (4) he was denied FMLA benefits.  Ross v. Gilhuly, 755 F.3d 185, 192 (3d Cir. 2014); see also Callison v. City of Philadelphia, 430 F.3d

2

117, 119 (3d Cir. 2005) (A plaintiff can establish interference by showing "that he was entitled to benefits under the FMLA and that he was denied them.").

To establish a retaliation claim under either the ADA or FMLA, an employee must show: (1) a protected activity; (2) an adverse employment action; and (3) a causal link between (1) and (2). Ross, 755 F.3d at 193 (FMLA retaliation); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 (3d Cir. 2003) (ADA retaliation). Retaliation claims under either statute are analyzed under the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, once plaintiff (1) produces sufficient evidence to establish a prima facie case of discrimination, and (2) defense provides "legitimate justification" for the adverse employment action, then (3) the plaintiff must show that the legitimate justification was mere pretext for discrimination. Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 256 (3d Cir. 2014). To survive summary judgment in a case that turns on pretext, an employee must identify "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). Moreover, that evidence must apply to "each of the employer's . . . nondiscriminatory reasons." Kautz, 412 F.3d at 476.

II.     Facts in the Light Most Favorable to Regan

A. *Early Employment at Temple*

Regan was hired by Temple University in January 2014.[1] St. Und. Facts (doc. 27) ¶ 1. As Audiovisual and Instructional Technologies ("AV") Manager for Temple University's Fox

---

[1]     Undisputed employment records submitted by Temple show that, in June 2006, Regan was terminated from a job at the University of the Arts based on failure to arrive on time, failure to stay for the entire workday, excessive absences, and unprofessional demeanor. Mot. Ex. 103

School of Business and School of Tourism and Hospitality Management ("STHM"), he maintained the AV equipment used in Fox's and STHM's facilities with the help of two part-time employees and several student workers who all reported to him.  Id. ¶¶ 13, 19, 25; Mot. Ex. 77 (doc. 26-4).  He reported to Vikram Singh, who supervised both the Information Technology ("IT") and the AV departments for those institutions.  Id. ¶ 1.

In December 2014, Regan applied for and received intermittent FMLA leave in anticipation of his daughter's birth.  Mot. Ex. 79 (doc. 26-45).  Singh and Regan were both notified by email when Regan qualified for FMLA leave.  Id.  The email informed them that Regan was required to notify and update his department regarding FMLA absences and complete the required paperwork for each absence.  Id.

In February 2015, Regan's daughter was born with significant physical impairments and he began utilizing his FMLA benefits.  Resp. Ex. Y ("Timeline") (doc. 34-3) at 165.[2]  He started with several weeks of continuous leave.  Id.  When Singh called Regan with a work question two weeks into this absence, Regan informed Singh that he was on leave and refused to answer any work questions.  Id.  After returning to work following three weeks of continuous leave, Regan began taking intermittent FMLA leave to attend his daughter's medical appointments and treatments.  Id.

---

(doc. 26-52).  In October 2013, Regan sued for retaliation based on sex discrimination following his termination from Real Time Services, Inc.  Mot. Ex. 102 (doc. 26-51).

[2]      All response exhibits are uploaded as document 34-3.  In the fall of 2017, Regan began keeping a "timeline" documenting his complaints about his Temple colleagues.  Resp. Ex. A ("Regan Dep.") at 177.

Although Regan did not request or receive intermittent FMLA leave during 2016, he received it for 2017 and 2018.[3]  Mot. Ex. 79.  As of 2017, Regan's leave was also limited by category to: no more than three leaves for "appointments" per week; no more than three leaves for "treatments" per week; no more than three days of leave for "care" per week; no "appointment" leaves of more than four hours; no "treatment" leaves of more than four hours; and no "care" leaves of more than one hour.  Id. at 7.

In June 2015, Singh told Regan that a promotion Regan had been promised in 2014 was no longer possible in part because Regan had "too much going on at home for more responsibilities at work."  Timeline at 165.  In August 2015, Singh confronted Regan about an absence, and Regan informed Singh of his right to use his intermittent FMLA leave to attend his daughter's appointments; Singh claimed he was unaware that Regan was entitled to intermittent FMLA leave at that time.[4]  Id.  On September 13, 2016, Regan complained to his superiors that an administrative employee who had yelled at him was creating a hostile work environment.  Id.

In May 2017, Regan was reminded by his department's timekeeper that he needed to notify the department each time he used his FMLA leave.  Resp. Ex. G; Timeline at 166.  In

---

[3]      Although Regan did apply for and receive intermittent FMLA leave during 2017 and 2018, his period of leave was not continuous because of various lags between the expiration of his approved periods of leave, his requests to renew his leave, and his completion of FMLA paperwork.  For example, although he was notified on January 13, 2016, that his original grant of FMLA would expire on January 26, 2016, he did not request another period of intermittent leave until January 2017.  Mot. Ex. 79.  Further, although he requested intermittent leave on January 24, 2017, to begin three days later, he did not submit the FMLA paperwork that was emailed to him that day until February 14, 2017.  Id.  On January 24, 2018, he requested another period of intermittent FMLA leave to begin that day, but did not submit the completed paperwork until March 2, 2018.  Id.

[4]      Although Regan's timeline notes that he has an email documenting such conversation, it is not included in the record.  Timeline at 165.  Nonetheless, in order to view the facts in the light most favorable to Regan, I assume a reasonable jury could find the conversation took place.

Regan's June 2017 evaluation, the last full evaluation before his employment was terminated in June 2018, Singh rated Regan "exceeds expectations."  Resp. Ex. B.  Nonetheless, Singh noted that Regan needed to focus on "[o]pen and timely communications and clear instructions."  Id.

In August 2017, during a discussion about ADA accommodations the AV department needed to implement, Singh told Regan to ignore the requirements, using a profane term.[5] Timeline at 166.  On September 7, 2017, Regan was told by one of his supervisees that Singh had been looking for him earlier and appeared angry upon learning that Regan was at an appointment.  Id.  Regan spoke with Singh, explaining that, whenever he utilized his FMLA leave, he informed his team how to contact him and informed the department timekeeper of his hours.  Id.  Singh told Regan that all the other employees were complaining that they wanted a similarly flexible schedule, that it was against university policy to leave campus during lunch, and that Regan had to "take care of [his] daughter but [he] just need[ed] to be [t]here."  Id.  After that meeting, Singh informed the rest of the AV/IT team that Regan was going to medical appointments for his daughter, which Regan felt violated his privacy.  Id.  Regan avers that he was "cut out of communications" within his department during the fall of 2017.  Id.

In January 2018, Senior Vice Dean Debbie Campbell became Singh's supervisor.  Mot. Ex. A (doc. 26-1) ("Campbell Dec.") ¶ 3.  Also that month, Regan approached Campbell's predecessor and told her he thought things had been going well over the last year.  Timeline at 168.  Campbell's predecessor told Regan that Singh had recently expressed satisfaction with

---

[5] Regan also alleges that, later that month, another colleague dismantled the communication system for Regan's team, which Regan regarded as retaliation for Regan's complaint that the colleague had not provided the laptops he had requested for that semester. Timeline at 167.

Regan's performance.  Id.  On January 25, 2018, Regan submitted a positive half-year self-review and was given no conflicting feedback.  Id.

On January 26, 2018, Singh was irate when he could not reach Regan by phone.  Id.  When Regan returned to the office, he informed Singh that he planned to renew his intermittent FMLA leave.  Id.  Regan explained that he tried to make his daughter's appointments during the lunch hour to miss fewer work hours and that he did not think it was fair that the rest of the staff was permitted to go off campus for social lunches but he was not permitted to go off campus for lunch time appointments.  Id.  Singh encouraged Regan to find a new job, explaining there was no room for Regan to advance at Temple.  Id.  He also stated, again, that Regan should "take care of [his] daughter but [he] just need[ed] to be [t]here."  Id.  On February 16, 2018, when the rest of the staff went out to a social lunch and never returned to the office, Regan locked up at the end of the workday and emailed to let them know he had done so.  Id. at 169.  On February 26, 2018, Singh singled Regan out and yelled at him, causing Regan's supervisees to ask Regan why Singh was so angry with him.  Id.

### B.  The First Discipline and Regan's Discrimination Complaints

On February 27, 2018, Sharif Sawyer, a part-time employee managed by Regan, complained to Singh about Regan.  Mot. Ex. 1 (doc. 26-4).  Sawyer described Regan: (a) calling Sawyer at home while Sawyer was ill and yelling about having to come in early to cover Sawyer's responsibilities; (b) using profane language; and (c) instructing Sawyer to stop communicating with the other supervisors in the AV/IT department.  Id.  Sawyer also said Regan left him as the only AV personnel without adequate instruction, and then chastised him for not doing what Regan would have done.  Id.  Finally, Sawyer attached screen shots of text messages

Regan had sent him that included the comments "use some common sense" and "get it together man." Id.

Other employees who were or had been supervised by Regan also told Singh about Regan asking them to water his plants and send personal packages, making unprofessional comments about coworkers, leaving the office and telling subordinates to text him with questions but not answering texts, missing requests for AV assistance, Mot. Ex. 3 (doc. 26-5), refusing to take responsibility for AV problems, unfairly finding supervisees at fault for problems they did not cause, and phrasing criticism unprofessionally, Mot. Ex. 4 (doc. 26-6) ("I will never forget the disrespect and unprofessional conduct I experienced").

On March 1, 2018, Singh emailed employees in the AV/IT department and informed them that they were required to work 40 hours per week, meaning that, if they took ½ hour for lunch, they needed to increase their time at work to 42.5 hours per week, etc.  Timeline at 170.

In a March 6, 2018, meeting with Singh and Campbell, Regan was given "verbal counseling," a form of discipline.  Campbell Dec. ¶ 10; Mot. Ex. 5 (doc. 26-7).  Documentation listed the three Temple work rules Regan had violated: (1) "early quit"; (2) "inefficiency"; and (3) "unprofessional behavior."  Id.  Regan was counseled not to investigate the identities of the complaining employees or to retaliate against them, but to focus on improving the professionalism of his communications, providing additional training to his subordinates, and better documenting his intermittent FMLA leave.  Campbell Dec. ¶ 11.  In the meeting, Regan complained that Singh was unsupportive of his attempts to manage incompetent vendors, making it impossible for Regan to do his job.  Timeline at 170.

After this meeting, Regan noted that one of his colleagues left early and told his other colleagues he would be in early the next morning without any of his colleagues objecting.

Timeline at 170.  Singh then took eight weeks of continuous FMLA leave to address a medical

issue.  Id.  Before leaving, Singh directed Regan's colleagues to dismantle a Webex feed Regan

had designed to allow the AV team to communicate in multiple locations.  Timeline at 171; Mot.

Ex. 7.  Contemporaneous emails show that some of Regan's supervisees were concerned he was

using the system to surveille them and determine who had complained about him.  Id.

On March 12, 2018, Regan met with EEOC Ombudsman Jodi Weisberg and complained

that he was being targeted because of his intermittent FMLA leave.  Resp. Ex. H.  He noted that

had been cited for "early quit," even though he was entitled to utilize his intermittent FMLA

leave for appointments related to his daughter's care.  Id.  He also complained that his

supervisees had complained about his management style anonymously.  Id.  He was advised to

document his intermittent leave using both the standard human resources form and the additional

text and email communications requested by his supervisor and timekeeper, and was informed

that the complaining supervisees were entitled to anonymity.  Id.  Shortly after this meeting,

Regan sought to discipline Sawyer, but was prevented from doing so.  Resp. Ex. D.  He then

asked to fire another supervisee who had complained about him.[6]  Mot. Ex. 16 (doc. 26-13).

On March 19, 2018, Regan met with Campbell, Weisberg, and a Human Resources

department employee.  Timeline at 171.  He again complained that he was being targeted

because of his intermittent FMLA leave, and reported several inappropriate comments Singh had

made about various protected groups.  Id.  On March 20, 2018, a vendor emailed Singh to

---

[6]     According to Regan, Temple impeded his ability to effectively manage his team by
preventing him from effectively disciplining his supervisees because of his colleagues' anger
over his FMLA leave. Timeline at 171.  According to Temple, Regan did not have sole authority
to fire his supervisees, the University was required to protect them from retaliation, and
discipline of Sawyer, a union member, required engaging with the union representative.  Mot.
Ex. A ¶¶ 11, 14; Mot. Ex. 16 (doc. 26-13); Resp. Ex. D.  Neither party disputes that Regan
sought to discipline and fire his supervisees and was prevented from doing so.

apologize for the failure of a recent AV project but also to complain that Regan had undermined the project by being unresponsive and inadequately training his staff.  Mot. Ex. 14.  That same day, one of Regan's direct reports sent him a positive reference via email.  Resp. Ex. F.

On March 23, 2018, Campbell removed the "early quit" violation, explaining there was no "concrete evidence" Regan had left work early without a valid FMLA appointment.  Mot. Ex. 18 (doc. 26-14).  Regan met with Campbell and Weisberg twice more and Campbell alone once to discuss his job performance and complaints about his colleagues in March and April 2018. Timeline at 171.

In April 2018, Sawyer was denied FMLA leave, but then permitted to miss work for medical reasons.  Timeline at 175.  That same month, broken locks on a back door to the offices where Regan worked were replaced.  Mot. Ex. 21 (doc. 26-16).  One of Regan's colleagues was given keys to the new locks but Regan was not, which meant that his colleague could enter through the back door while Regan had to enter through the front door.[7]  Id.  On May 10, 2018, Regan's departmental timekeeper asked him about an FMLA form he had submitted.[8]  Timeline at 175.

---

[7]     Regan contends the locks were replaced to impede his ability to get to and from his appointments.  Timeline at 175.  Temple claims that the locks were needed to protect the expensive equipment stored in the office and that, because the door could be used by anyone to exit but required individuals who did not have a key to use the front door to re-enter, it was safe for emergency exit but reasonably prohibited secretive re-entry designed to avoid timekeeping. Campbell Dec. ¶ 15.

[8]     According to Regan, the timekeeper challenged his use of FMLA leave improperly, and spoke to him about the issue in front of others, violating his right to privacy.  Timeline at 175. According to contemporaneous emails from the timekeeper, he did not discuss or ask about improper medical issues, but rather asked how to categorize the leave time because Regan had listed all six hours as "treatment/appointment" and the timekeeper needed to know the breakdown for FMLA recordkeeping.  Mot. Ex. 30 (doc. 26-21).

C.  *The Second Discipline and Regan's Request for ADA Accommodations*

On May 13, 2018, Regan met with Campbell and Singh.  Timeline at 176.  They declined

Regan's request to attend an upcoming professional conference, and Singh explained that Regan

had not used prior conferences to improve the service he provided at Temple by, for example,

providing additional training to his supervisees or reducing his reliance on outside vendors.  Mot.

Ex. 26 (doc. 26-18).  Regan disputed this reasoning, contending that, because he was a manager

and not a technician, learning to fix things was not his job, and he should be permitted to attend

conferences to learn what new technologies were available.  Id.  When Regan protested the

conference decision further, Singh and Regan began arguing heatedly.  Id.  Singh accused Regan

of "milking" his intermittent FMLA leave.  Id.  Campbell noted shortly after the incident that

several colleagues stopped by afterwards to ask about the "disturbing" confrontation that had

taken place in her office.  Id.  Both Singh and Regan were disciplined for their unprofessional

argument.  Id.  Because this was Singh's first violation, he received a verbal warning.  Id.  Regan

received a three-day suspension for his second violation.  Mot. Ex. 27 (doc. 26-19).

On May 15, 2018, Regan emailed Campbell, complaining that his work performance was

being deliberately sabotaged by Singh and his other colleagues.  Resp. Ex. T.  Regan said he

heard Singh complaining about his taking intermittent FMLA leave, hypothesizing that Regan

was "taking it out on everyone else because [he] ha[d] a daughter with special needs," saying

disparaging things about protected groups, drinking socially in the office during business hours,

and undermining Regan's ability to hire sufficient staff.[9]  Id.

---

[9]      When Campbell investigated Regan's claim about his department's failure to hire staff,
she was told that the department was resisting Regan's request to hire engineering graduate
students, whom his colleagues viewed as over-qualified and used improperly by Regan to avoid
his core job responsibilities of training and active supervision.  Mot. Ex. 7.

That same day, Regan contacted Temple's Human Resources department and asked for official recognition of "two disorders and a disability" so that he could request ADA accommodations.  Resp. Ex. Q.  Two days later, he was provided a form for himself and a form for his doctor to fill out.  Id.  On June 1, 2018, Regan sent the required ADA form to his medical provider.  Id.

*D.  The Conference*

On June 13-16, 2018, Fox Business School hosted an unusually large conference.  Mot. Ex. A ¶ 19.  In preparation, AV and IT staff held multiple meetings with the conference organizers.  Mot. Exs. 33, 34.  Regan and other AV and IT staff were provided explicit, written instructions to test the equipment for each room at the beginning of each day as well as to provide support during the conference itself.  Mot. Ex. 34.  In response to Campbell's direct written request, Regan assured her via email that he would be present at the conference.  Id. ("Yes, including me as well.").

He did not attend the first, smaller day of the conference.  Mot. Ex. 71.  On the second day of the conference, June 14, 2018, Regan's supervisees and the IT team, including the IT managers with manager positions equivalent to Regan's, arrived earlier than their usual start times, between 6:45 am and 7:15 am, but Regan did not.  Mot. Ex. 36.  Regan spent the morning caring for his daughter, but did not provide his colleagues advanced notice that he was taking FMLA leave because his regular hours began at 9:30 am.  Resp. Ex. W.  Sawyer complained to Singh and the rest of his colleagues at around 9:15 am that the morning had been overwhelming, and requested additional equipment testing from the evening staff before the next day's session. Mot. Ex. 36.

Regan checked in with the conference organizer for the first time on June 14th after the rest of the AV team and the IT team had worked together to solve the major issues that had arisen in the early morning.  Mot. Ex. 71 (doc. 26-41).  Singh emailed Regan about an hour later, asking why Regan had not been present that morning, the busiest part of the conference.  Mot. Ex. 36.  Regan later explained that he had been assisting his daughter that morning before work, and submitted paperwork for "0 hours" of intermittent FMLA leave.  Resp. Exs. U, W.  Some time between 11:30 and noon, Campbell came to Regan's office and instructed him to go to the conference and find the conference organizer.  Regan Dep. at 105.  He went to the conference but returned to his office after not being able to find the conference organizer and observing no problems.  Id. at 105.  Regan then spoke with his colleagues, who told him that they were frustrated by covering for him when he was out of the office for hours when no one knew where he was, that his FMLA leave was a "technicality," and that he did not manage his staff.  Timeline at 176.

Regan left for a planned appointment with his daughter, utilizing his intermittent FMLA leave, and returned by 2:00 pm.  Mot. Ex. 54; Regan Dep. at 107-08.  Regan did not see the conference organizer again until approximately 5pm.  Mot. Ex. 71.  He stayed until 8:30 pm, ensuring the facilities were set up for the following morning.  Mot. Ex. 54.

The following day, when all his colleagues arrived between 6:30 am and 7:30 am, Regan arrived before 9 am.  Mot. Ex. 71.  Later, when Regan asked Sawyer for assistance, they argued in public, and Sawyer threatened to make Regan's ears bleed by yelling at him.  Regan Dep. at 119; Mot. Ex. 54.  Around noon on June 15, 2018, Campbell suspended Regan pending an investigation about his performance during the conference, his failure to follow her directive the prior day, and his unprofessional confrontation with Sawyer.  Campbell Dec. ¶ 24.  Before

leaving campus to begin his suspension, Regan said that he reported to the Temple Police that Sawyer had threatened to make his ears bleed.  Mot. Ex. 52.  He emailed Temple Human Resources personnel that Sawyer had threatened to hit him and to make his ears bleed and provided the name of a supervisee who he claimed would corroborate his version of events. Mot. Ex. 56.

The next day, Saturday, June 16, 2018, Regan emailed Temple Human Resources to follow up on his request for ADA accommodations.  Resp. Ex. Q.  He stated that he had sent in his ADA form several weeks earlier, and when he was informed that it had not been received, he sent it via email.  Id.  The following day, Sunday June 17, 2018, he scanned and sent in the completed form from his medical provider.  Id.; see also Resp. Ex. R (ADA form requesting accommodations for post-traumatic stress disorder (PTSD), attention deficit hyperactivity disorder (ADHD), and dyslexia; medical form requesting flexible schedule, 1 day/week telecommuting, and 2 hours per week out for counseling).

During her investigation of Regan's performance at the conference, Campbell found that, despite his claim to Human Resources, Regan had not reported to Temple police that Sawyer had threatened to physically strike him (Mot. Ex. 52), the supervisee Regan had identified did not corroborate his version of the argument with Sawyer (Mot. Ex. 70), and another employee reported a different, less threatening version of the exchange, Mot. Ex. 65 (describing Sawyer's statement as denying that he had been yelling at Regan and saying that, because he was a classically-trained singer, if he would yell it would make Regan's ears bleed); Campbell Dec. ¶¶ 27-28.  Campbell fired Regan based on his disciplinary history and his performance during the conference, which included delegating too many of his responsibilities.  Id.; Regan Dep. at 90. Regan concedes that Campbell was the primary decision-maker in his disciplinary and

termination decision.  St. of Undisputed Facts (doc. 27); Resp. to St. of Undisputed Facts (doc. 34-2) ¶ 11.

Regan was making approximately $81,000 per year at the time of his termination.  Regan Dep. at 43.  In March 2019, Regan began employment with American Water Company at a salary of $120,000 per year.  Mot. Ex. 101.

III.    Analysis

1.  ADA claims

All of Regan's ADA claims fail.  Regan's ADA failure to accommodate claim fails because there is no evidence Temple failed to engage in the interactive process.  When Regan notified Temple of his intent to seek accommodations, he was provided the requisite paperwork within two days.  Resp. Exs. P, Q.  It was Regan who failed to return the completed forms for several weeks, not Temple.  See Colwell v. Rite Aid Corp., 602 F.3d 495, 507 (3d Cir. 2010) (upholding summary judgment in favor of employer who reasonably thought accommodations were no longer needed).  By the time Regan returned the completed paperwork, he was already in the midst of his final suspension.  Resp. Exs. Q, R.  There was no opportunity for Temple to further engage in the interactive process and accommodate his alleged disabilities before he was terminated.

Regan's ADA discrimination claim fails because he has produced no evidence that Campbell knew of his qualifying disability during his progressive discipline and termination.  His associational discrimination claim fails because he has produced no evidence that Campbell terminated him based on "unfounded stereotypes or assumptions" that he would miss work in the

future to take care of his daughter.[10]  Erdman v. Nationwide Ins. Co., 582 F.3d 500, 511 (3d Cir. 2009).  Regan's ADA retaliation claim fails because he has not identified any ADA-protected activity that could have served as the basis for retaliation; as explained above, his request for accommodation was made too late to constitute the basis for any of the adverse employment actions taken against him and any associational claim would have to be based on an "unfounded assumption," not historical experience.  Reddinger, 4 F. Supp. 2d at 409.

2.   FMLA claims

Regan's FMLA interference claim fails because he fails to identity any evidence that Temple prohibited him from taking FMLA leave.  See Regan Dep. at 75 (Temple never denied a request for FMLA leave); Ross, 755 F.3d at 192 (denial of FMLA benefits is an element of an FMLA interference claim).

For his FMLA retaliation claim, Regan has established a prima facie case of retaliation because he has shown that his progressive discipline and termination took place during the same time that multiple colleagues and Singh, his direct supervisor, complained about his absences. See generally, Timeline.  Temple argues it had a legitimate justification for terminating him due to Regan's performance after a series of progressive disciplinary steps.  Campbell Dec. ¶ 29. Regan contends that Temple's legitimate justification is mere pretext for discrimination against him because of the leave he took to care for his daughter.  Resp. at 11.  The claim turns on whether Regan has produced sufficient evidence that "a factfinder could reasonably . . .

---

[10]    Associational discrimination claims are distinguishable from FMLA retaliation claims because FMLA retaliation claims are based on an actual "record of past absences and/or clear indication that additional time off will be needed in the future," while associational discrimination claims are based on "unfounded" discriminatory assumptions that such absences will occur.  Reddinger v. Hosp. Cent. Servs., Inc., 4 F. Supp. 2d 405, 409 (E.D. Pa. 1998).

disbelieve [Temple's] articulated legitimate reasons."  Lichtenstein v. Univ. of Pittsburgh Med.

Ctr., 691 F.3d 294, 310 (3d Cir. 2012).

The majority of Regan's complaints regarding untoward comments and sabotaging his

performance involve his direct supervisor, Singh, and his AV/IT department colleagues, not

Campbell.  Yet, Regan concedes that Campbell alone decided to terminate him.  Resp. St. Facts ¶

23.  Campbell was involved in six of the incidents Regan contends support a finding of pretext:

(1) the "early quit" discipline; (2) the Webex incident; (3) preventing him from disciplining

and/or firing his supervisees; (4) the door lock incident; (5) the "milking" comment; and (6) the

conference.  Even viewed in the light most favorable to Regan, those incidents do not support a

finding that Campbell's justification for firing him was pretext.

Campbell issued the "early quit" discipline in conjunction with Singh.  Mot. Ex. 5.  She

removed it, however, after Regan protested and her investigation showed Singh could not

substantiate his claim that Regan was leaving at times that were not authorized under FMLA.

Mot. Ex. 18.  Campbell did not rescind the entire discipline and the record shows at least one of

the other justifications for the discipline, unprofessional behavior, was based on written

complaints from multiple supervisees, not just Singh.  St. Und. Facts ¶ 13; Mot. Exs. 1, 3, 4; see

also Kautz, 412 F.3d at 476 (upholding summary judgment when just one of multiple legitimate

justifications was not pretext).  Regan does not dispute the authenticity of his supervisees'

complaints, which corroborate one another.  Mot. Exs. 1, 3, 4.  Instead, he contends that the

credibility of those complaints should be questioned because of a "glowing" positive email from

one supervisee.  Id.  Employers, however, are not required to exhibit good judgment, they simply

cannot discriminate.  Rumanek v. Indep. Sch. Mgmt., Inc., 619 F. App'x 71, 80 (3d Cir. 2015).

Even if the supervisees' complaints were not justified, Campbell's decision to credit them and

issue a "verbal warning" based on them is not so "weak[], implausibil[e], inconsisten[t], incoheren[t], or contradict[ory] . . . that a reasonable factfinder could rationally find [it] unworthy of credence." Fuentes, 32 F.3d at 765.

In terms of the "Webex" incident, Regan argues Singh ordered the system dismantled in retaliation for his FMLA leave and to undermine his job performance. Timeline at 171. Contemporaneous emails, however, show that Campbell received written complaints that Regan's supervisees felt he used the system to surveille them, not communicate for work purposes. Mot. Ex. 7, 89. Regan's subjective beliefs are insufficient to create a reasonable inference of retaliation in light of unrefuted documentary evidence. Campbell was required to protect Regan's supervisees from potential retaliation when, mere weeks after Regan was disciplined based on their complaints, he demanded their discipline and even sought to fire the same employees who had complained about him. Mot. Exs. 10, 16, 99 p. 51.

Campbell ordered the door locks replaced with a mechanism that permitted exit but not re-entry because "[i]t [was] unsafe to have a back entrance open [where] [a]nyone could enter and steal equipment and . . . hurt staff or students that are unaware that someone has entered an unmonitored door." Mot. Ex. 22; see also Campbell Dec. ¶ 15. Campbell noted that Regan's colleagues suspected he was using that door to prevent accurate timekeeping of his absences. Id. Because Regan testified that the additional time required to re-enter from the front door was approximately 30 seconds, Regan Dep. at 144, and Campbell had received complaints from Regan's colleagues that he was abusing his access to the door, her approval of the repaired lock fails to create a reasonable inference of harassment, rather than a reasonable business decision, even when viewed in the light most favorable to Regan. See Hollingsworth v. R. Home Prop. Mgmt., LLC, 498 F. Supp. 3d 590, 605 (E.D. Pa. 2020), ("Although I must view the record in the

18

light most favorable to the Plaintiff, I need only resolve reasonable inferences in the non-moving

party's favor."), *appeal dismissed sub nom.* Hollingsworth v. R. Home Property Mgmt. LLC,

No. 20-3226, 2021 WL 1750124 (3d Cir. Apr. 20, 2021).

Campbell was also present when Singh made the inappropriate comment that Regan was

"milking" his FMLA leave, Mot. Ex. 26, and she disciplined Singh for making it.  Id.  Regan

disputes Temple's contention that Singh was disciplined, noting that it did not produce any

disciplinary documentation.  Resp. St. Facts ¶ 23.  Campbell averred in her sworn statement that

Singh received a verbal warning because it was his first discipline, Campbell Dec. ¶ 17, and

Regan offers no evidence to refute that fact other than his subjective belief.  Regan also has

failed to show that he requested corroborating documents in discovery.  Without evidence that he

asked for documents and did not receive them, and with Campbell's sworn statement that Singh

was verbally disciplined, Regan has no factual basis to dispute Singh's discipline.  In re Boger,

No. 13-00669, 2022 WL 756663, at *9 (Bankr. E.D. Pa. Mar. 10, 2022) ("an inference based

upon a speculation or conjecture does not create a material factual dispute sufficient to defeat

summary judgment [because] [i]nferences must flow directly from admissible evidence.") (citing

Prince v. BAC Home Loans Servicing, LP, No. 16-1544, 2018 WL 4154947, at *2 (E.D. Pa.

Aug. 30, 2018)).

Finally, Campbell was present and participated in supervising Regan during the June

2018 conference, where his inadequate performance led to his final suspension and termination.

Regan concedes that he was told he was being suspended pending termination for his

"performance during the conference and his failure to follow direct requests from supervisors,"

but disputes that he failed to follow any requests or had any performance problems.  St. Und.

Facts. ¶ 31.

Regan disputes that he deliberately disregarded Campbell's instruction to find the conference organizer.[11]  Resp. Und. Facts. ¶ 29.  Instead, he merely avers that he "could not find [her]" after checking the conference rooms, and left.[12]  Id. ¶ 27.  Whether Regan's failure to find the conference organizer was intentional or unintentional is immaterial because the uncontested evidence establishes that he did not find the conference organizer as instructed.  Id.  Thus, the "failure to follow direct requests from supervisors" basis for his final suspension is undisputed, and provides no factual dispute for a jury to resolve.

Regan also disputes that his "delegation of work was in direct contradiction to any specific instruction by Campbell."  Resp. to St. Und. Facts. ¶ 30.  Temple, however, has not alleged that he was specifically instructed not to delegate any specific work.  St. Und. Facts ¶ 30. Instead, Temple alleges that part of his unsatisfactory performance at the conference was "delegating most of his work to others."  Id.

Regan has not challenged the authenticity of any exhibits, and Temple has produced a June 8, 2018, email exchange in which Regan assured Campbell that he, not just his staff, would attend the conference.  Mot. Ex. 34.  Yet he failed to attend the conference's busiest hours.  Mot. Exs. 36, 71.  Regan asserts this was appropriate because he was a manager, Regan Dep. at 117-18, but it is undisputed that the other managers in his department knew that it was important for

---

[11]    Campbell and the EEOC ombudsman who were present for Campbell's instruction both assert that Campbell instructed Regan to find the conference organizer and stay with her.  Mot. Exs. 63, 72.  In order to view the facts in the light most favorable to Regan, however, I will assume that Campbell simply instructed Regan to find the conference organizer.

[12]    At least one of Regan's colleagues asserts that Regan did not look for the conference organizer at all, but "instead" went directly to a group of colleagues near his office and spent 45 minutes speaking with them.  Mot. Ex. 69.

them to show up in person for the conference's busiest time period, Mot. Ex. 36 ("Everyone else is coming in early to support the startup").

Regan argues that his absence is protected from criticism because he was taking FMLA leave, caring for his daughter before 9:30 am on the conference's busiest morning.  Mot. Ex. 54. He frames the dispute as simply one of hours, asserting that his supervisor should have specifically informed him if he needed to be in before his regular starting time because of his protected, FMLA status.  Mot Ex. 40.  His peers in the IT department, however, each opted to come in early for such a major event, and even Regan stayed beyond his regular hours to accomplish all the extra work without explicit instruction to do so.  Mot. Exs. 54, 65-69; Regan Dep. at 100.  Further, Regan did not notify his colleagues that he would be utilizing his FMLA leave in the early morning beforehand, the way he did for his afternoon appointment that same day.  Mot. Ex. 54.  If Regan knew he needed to care for his daughter on the busiest morning of the largest conference, he was entitled to use his FMLA leave, but that would have required him to provide his colleagues prior notice of his absence and coordinate coverage.  Mot. Ex. 79 ("you are required to notify and update your department regarding planned and/or unforeseeable absences.").  Instead, he claimed he was taking FMLA leave during that time period only after his absence was criticized.  Resp. Ex. W.  Even at the summary judgment stage, I am not required to make unreasonable inferences in Regan's favor by finding that Regan was simply using his intermittent FMLA leave when he decided to skip the busy morning hours of the conference on June 14th.  Hollingsworth, 498 F. Supp. 3d at 605.

In his deposition, Regan conceded that he did not attend the conference that morning because, as a manager, he did not have the responsibility to get up early and do the hands-on work required to get the conference started smoothly.  Regan Dep. at 98, 144.  He testified that

the reported problems at the conference constituted additional acts of FMLA retaliation by his colleagues because "[t]here were no crises, no.  There were day-to-day IT support issues that are a normal part of job responsibilities that [his part-time employees and his colleague in the IT department] would handle on a day to day basis."  Id. at 101.  In contrast, the conference organizer described the rest of the AV and IT staff, including Singh and one of Regan's student employees who "was not adequately prepared to assist with this event," fixing multiple problems throughout the morning of June 14th.  Mot. Ex. 71; see also Mot. Exs. 37 (describing the "insane" number of issues the morning of the 14th, and noting that "trying to attend setups and help calls as well as normal duties has been an absolute nightmare"), 38 (detailing the hands-on AV work performed by the Technical Support Manager during the morning hours of June 14th), 40 (describing the work performed by the Assistant IT Director and others during the early morning hours of June 13 and 14, including some work that "could [have] been taken care of yesterday if there was some forethought on [Regan's] part."), 65 (describing the morning of June 14th as "short-staffed because we did not have the AV manager there to direct and handle the issues that cropped up in the classrooms/conference rooms").

The undisputed evidence shows Regan's absence from the conference on the morning of June 14, 2018, was a personal decision, not protected leave, because he testified he did not have any responsibility to be present at that busiest part of the conference and did not recognize that his absence created problems.  Regan Dep. at 98-101.  This understanding of his job responsibilities fundamentally differed from Singh's and frustrated his colleagues in his department and the IT department, who repeatedly complained from January through June 2018 that they were regularly compelled to perform the hands-on parts of their jobs and Regan's, even when he was on campus and not utilizing his FMLA leave.  Mot. Exs. 1, 3, 4, 14, 26, 65, 68, 69,

71.  As a result, Regan's justification for his absence at the conference, which does not involve a

need to use FMLA, eliminates the need for the jury to weigh whether Campbell retaliated against

Regan for using FMLA.  Instead, Regan's testimony shows his poor performance at the

conference was caused by his professional judgment.

Campbell was entitled to find that, because Regan did not align his performance with the

expectations of his supervisor and colleagues, he performed his job inadequately.  This is exactly

the kind of "business judgment" that the law protects.  <u>Brown v. Nutrition Mgmt. Servs. Co.</u>, 370

F. App'x 267, 271 (3d Cir. 2010) (upholding jury instructions that repeatedly admonished jury

not to evaluate the "business judgment" of employer in FMLA discrimination case).

Finally, part of Campbell's criticism of Regan's performance at the conference was based

on his dispute with Sawyer.  Campbell Dec. at ¶ 24.  Regan denies that he lied about being

physically threatened by Sawyer, arguing it is unfair to interpret his report to Temple Police

about Sawyer's threats to make his ears bleed as not constituting a physical threat.  Resp. St.

Facts ¶¶ 33-34.  This is misleading.  On June 15, 2018, Regan emailed two people in Temple's

Human Resource department that Sawyer had "threatened to hit him," and to "make his ears

bleed," that he had reported the incident to Temple Police, and that one of his students would

corroborate his story.  Mot. Ex 56.  Upon investigation, Campbell learned that Regan had

reported only the "ears bleeding" threat to Temple Police, Mot. Ex. 52, his student did not

corroborate his story, Mot. Ex. 70, and no other witness heard Sawyer threaten to hit him, Mot.

Exs. 65-69.  Moreover, when recounting the incident under oath, Regan did not repeat his written

assertion that Sawyer had threatened to "hit[]" him.  Regan Dep. at 119.  No reasonable jury

could find that Regan did not lie about the confrontation with Sawyer in the June 15 email.  Mot.

Ex. 56 (June 15 email to Human Resources stating "Sharif Sawyer threatened me with bodily harm by hitting me").

Regan's progressive discipline consisted of the verbal discipline, the 3-day suspension, the suspension pending termination, and the termination.  Campbell Dec. ¶ 29.  There is no dispute that: (1) Campbell was the decision-maker regarding Regan's termination; (2) several of Regan's supervisees complained about his management in February 2018; (3) Regan fought with Singh in a manner Campbell found unprofessional in her office in May 2018; and (4) Regan failed to follow Campbell's direct instruction, delegated the hands-on work during the busiest part of the conference to others, and then lied to Human Resources about his conflict with Sawyer at the June 2018 conference.  No "factfinder could reasonably . . . disbelieve [Temple's] articulated legitimate reasons."  Lichtenstein, 691 F.3d at 310.

The facts that Regan relies upon to make his prima facie case and that he argues establish pretext either do not involve Campbell, or simply do not undermine the undisputed facts that justify his termination.  Moreover, even if a jury could find one justification was pretext, Regan would have to prove all of the legitimate justifications were pretext to survive summary judgment.  Kautz, 412 F.3d at 476.  He has cited no evidence to support such a claim.  Thus, I will enter summary judgment in favor of Temple on Regan's FMLA retaliation claims.

An appropriate Order accompanies this opinion.